UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT AT HARTFORD

FILED
2016 NOV 18 A 9:44
US DISTRICT COURT

**COMPLAINT**

| | | |
|---|---|---|
| Donald Hope BFPE Case #15-068 R | : | |
| | : | |
| v. | : | |
| | : | Date:__________ |
| Board of Firearms Permit Examiners | : | |
| (BFPE) | : | |
| and | : | |
| Department of Emergency Services | : | Case#: 3:16-cv-1888 JCH |
| and Public Protection | : | |
| (DESPP) | | |

A. Parties

1. Plaintiff Donald Hope is a citizen of Connecticut who presently resides at 98 Bainbridge Rd., West Hartford, CT 06119
2. Defendant Board of Firearms Permit Examiners is an administrative unit of the State of Connecticut whose address is 20 Trinity Street 5th Floor, Hartford, CT 06106
3. Defendant Department of Emergency Services and Public Protection is an administrative unit of the State of Connecticut whose address is 1111 Country Club Rd., Middletown, CT 06790

B. Jurisdiction - The jurisdiction of this court is invoked pursuant to:

Americans with Disabilities Act, Title II – 28 CFR Part 35

C. Nature of the Case – Brief Summary

On May 15, 2014 Plaintiff thought he heard an intruder in his home and was concerned that his wife would soon return from running errands and enter an unsafe house. He didn't have access to a working phone. He chambered a round in a .22 long gun to descend from the second floor to the first floor of his home. He was recovering from painful foot surgery. His wife returned from an errand and saw him in the kitchen holding the long gun and he immediately asked her to call 911. He spoke to the 911 dispatcher and told them he thought he heard noises or voices in the basement and did not want to investigate himself. He never went into the basement with the firearm. He un-loaded the firearm, placed it in his first floor office and waited with his wife outside of the house for the police to arrive.

The Plaintiff didn't own a pistol at the time (other than non-working Civil War relics). The rifle was never brandished, displayed, taken from the interior of the home or pointed at anything but the ceiling. No police officer ever saw him holding the firearm and when they arrived at the scene he instructed the police that there was an un-loaded firearm, action open, in his office.

Sgt. Vafiades, the lead officer at the scene, specifically documented that the Plaintiff did not commit threats or acts of violence to himself, his wife or any other person that day and had no history of threats or acts of violence. In fact, Plaintiff is a law-abiding and extremely responsible citizen. His wife, a psychiatric nurse, told the police she thought the Plaintiff was acting in a paranoid manner due to over-medication of one of the drugs prescribed for his early stage

Parkinson's disease. The evening before, May 14, 2014, the plaintiff had called the police to investigate suspected intruders at his office building and that complaint was deemed un-founded.

Plaintiff fully agrees that he was hyper-vigilant, fearful and suspicious at that point in time, i.e. paranoid, due to over-medication with a dopaminergic medication, a transient medical event.

As a result of these events Plaintiff's firearms were seized pursuant to a 'risk warrant' executed on May 19, 2014 and that in turn resulted in the DESPP revoking his pistol permit.

After a third contact with the police on May 16, 2014 for allegedly acting confrontational with the across the street neighbors (who were in Florida at the time) the police forcibly entered his home without a warrant and Plaintiff was taken to Hartford Hospital E.D. and from there was sent for evaluation at the Institute of Living on May 17, 2014 on a 15 day physician's emergency evaluation certificate.

There his Parkinson's meds were brought down to normal limits, his mental status cleared and he was discharged from the evaluation period without being committed by a probate judge. The Board repeatedly and wrongly used the term "EC" (emergency committal). This is the only time in his life that he was ever hospitalized for psychiatric evaluation and treatment. The disorder was caused by a transient medical event, over-medication, and not by mental illness.

In August of 2014 Plaintiff filed a timely appeal to the revocation of his pistol permit and two years later on June 9, 2016 he appeared before the Board

of Firearms Permit Examiners to argue for its reinstatement and renewal. The DESPP, (the Issuing Authority) appeared at the hearing represented by Atty. Sgt. Giannone to argue for the revocation.

The Board voted to sustain the revocation of Plaintiff"s Pistol Permit based entirely on reasons of disability discrimination in violation of Title II of the ADA.

D. Cause of Action – I allege that the following of my constitution rights, privileges, or immunities or my rights under a federal statute have been violated and that the following facts form the basis of my allegations.

1. Title II of the ADA applies to government entities and defines rights against disability discrimination that apply to qualified persons with a disability, a history of disability or of being "regarded as" having a physical or mental impairment that substantially limits a major life activity:

> "TEST C—BEING REGARDED AS HAVING SUCH AN IMPAIRMENT This test, as contained in paragraph (4) of the definition, is intended to cover persons who are treated by a public entity as having a physical or mental impairment that substantially limits a major life activity. It applies when a person is treated as if he or she has an impairment that substantially limits a major life activity, regardless of whether that person has an impairment. The Americans with Disabilities Act uses the same "regarded as" test set forth in the regulations implementing section 504 of the Rehabilitation Act. See, e.g., 28 CFR 42.540(k)(2)(iv), which provides: (iv) "Is regarded as having an impairment" means (A) Has a physical or mental impairment that does not substantially limit major life activities but that is treated by a recipient as constituting such a limitation; (B) Has a physical or mental impairment that substantially limits major life activities

> only as a result of the attitudes of others toward such impairment; or (C) Has none of the impairments defined in paragraph (k)(2)(i) of this section but is treated by a recipient as having such an impairment."
>
> DOJ 28 CFR Part 35, Section 35-104

The Appellant is covered by the ADA under this "regarded as having an impairment" standard. He is capable of the Activities of Daily Living and, more to the point, is demonstrably capable of carrying, maintaining possession of, controlling and firing a handgun with reasonable skill, in either hand. However, he was "regarded as having an impairment" by the Board.

> The rationale for this third test, as used in the Rehabilitation Act of 1973, was articulated by the Supreme Court in *Arline*, 480 U.S. 273 (1987). The Court noted that although an individual may have an impairment that does not in fact substantially limit a major life activity, the reaction of others may prove just as disabling. "Such an impairment might not diminish a person's physical or mental capabilities, but could nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." *Id.* at 283. The Court concluded that, by including this test in the Rehabilitation Act's definition, "Congress acknowledged that society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment." *Id.* at 284. DOJ 28 CFR Part 35, Section 35-104

To comply with the ADA a governmental entity is not allowed to discriminate against a person on the basis a disability or of a person "regarded as being disabled" in any of the following ways:

> § 35.130 General prohibitions against discrimination.

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration—

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

DOJ 28 CFR Part 35 Section 35.130

***6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability*** (emphasis added)**,** nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

DOJ 28 CFR Part 35 Section 35.130

(h) A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. ***However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.*** (emphasis added)

DOJ 28 CFR Part 35 Section 35.130

2. Suitability –

"On an appeal to the board from a decision of a local authority or the commissioner to refuse to issue or renew a firearms permit, to limit a permit, or to revoke one, the statutes provide in pertinent part that the board 'shall inquire into and determine the facts, de novo, and unless it finds that such a …revocation…would be for *just and proper cause* (emphasis added) it shall order such permit or certificate to be…restored.' General Statutes section 29-32(b). Logically, the determination of whether there is 'just and proper cause' in a revocation case focuses on the commissioner's statutory authority to revoke a permit in the first place. Pursuant to General Statutes section 29-32 (b), the commissioner may revoke a permit 'upon conviction of the holder of such permit of a felony or of any misdemeanor specified in subsection (b) of section 29-28 or upon the occurrence of any event which would have disqualified the holder from being issued the state permit or temporary state permit pursuant to subsection (b) of section 29-28.' " *Commissioner, DESPP v. BFPE, et al*, No. HHB CV 14-6026730S, Superior Court Judicial District of New Britain (2015) pg 4 (see Appendix)

The Plaintiff's Pistol Permit was lawfully revoked because on 5-19-2014 he was "subject to a firearms seizure order issued pursuant to sub-section (d) of section 29-38c after notice and hearing." General Statutes section 29-28 (b).

That order expired on 10-23-2015 and his longarms were returned to him by the WHPD after conducting due diligence.

The Plaintiff appealed the revocation of the Pistol Permit to the Board in a timely manner on 8-13-14. The DESPP Commissioner's authority to revoke Plaintiff's permit on appeal focuses on whether Plaintiff:

> "intends to make no use of any pistol or revolver which such applicant may be permitted to carry under such permit other than a lawful use and that such person is a *suitable person* (italics added) to receive such a permit." General Statutes section 29-28(b)

> "Although the statute does not define 'suitable' the Appellate Court has observed that the term reveals a 'legislative intent to protect the safety of the general public from individuals whose conduct has shown them to be lacking *the essential character or temperament* (emphasis added) necessary to be entrusted with a weapon.' *Commissioner of Public Safety v. Board of Firearms Examiners,* 129 Conn 414, 423, 21 A.3rd 847, cert denied, 302 Conn 918, 27 A.3d 369 (2011) " as cited by: *Commissioner, DESPP v. BFPE, et al,* No. HHB CV 14-6026730S, Superior Court Judicial District of New Britain (2015) p. 13 (see Appendix)

Therefore, the question before the Board on 6-9-2016 was whether the Plaintiff was "lacking the essential character or temperament necessary to be entrusted with a weapon." Procedurally, if the Issuing Authority fails to attend a hearing, the Board must find for the appellant in the case, therefore the burden of proof is on the Issuing Authority (in this case the DESPP). The Board must vote in the majority for the Issuing Authority to sustain a denial or revocation. If there is a tie-vote by the Board – the case is decided in favor of the appellant.

The Board has extremely wide ranging discretion. Stare decisis does not apply and in the present case hearsay testimony was allowed.

The decisions of the Board vary widely and inconsistently.[1],[2],[3],[4] However, despite the wide discretion afforded the Board by the state regulatory scheme, the Board is still obliged to follow Federal ADA law and not arrive at its decisions due to factors of disability discrimination.

Claim 1: The Board based its decision on speculation, stereotypes and generalizations about the Plaintiff's psychiatric disabilities or perceived disabilities. The Plaintiff's expert opinion was misread and grossly distorted. The Chairman explicitly stated that long term, successful, preventative outpatient psychiatric treatment was a disqualifying factor. The Board was privy to extremely damaging and incorrect allegations that exist in police records despite persistent efforts to correct toxic assertions. DESPP failed to prove its initial charge that the Plaintiff in June of 2016 was of "unsound mind", and any

---

[1] Lazurek v. BFPR – as cited in: *Commissioner, DESPP v. BFPE, et al, No. HHB CV 14-6026730S, Superior Court Judicial District of New Britain (2015) p.1,* see Appendix – Appellant Lazurek carried a loaded Glock 17 semi-automatic pistol in full view tucked into his waistband on a public boardwalk in proximity to a children's playground. When approached by a police officer and asked to show his pistol permit, he refused to show it and was arrested. At his BFPE hearing he was unrepentant and said he would do the same thing in the future. The BFPE ruled 3-3 in Lazurek's favor and the decision survived superior court challenge by the DESPP.
[2] BFPE Case# 14-094-D – Appellant's application for a pistol permit was denied by the Issuing Authority due to an incident of a cocaine overdose that resulted in emergency medical treatment. The Board voted 3 to "deny pistol permit – **for now**" and 2 to "deny"– i.e. the appellant was offered the chance to appear again with evidence of being clean of illicit drug use.
[3] BFPE Case # 14-292-D – Appellant's application for a pistol permit was denied by the Issuing Authority due to a history of hanging herself in the backyard of her home. Appellant has a daughter that was 11y/o at that time. The husband cut her down and administered CPR and called 911. The Board voted voted 3 to "deny pistol permit – **for now**" and 2 to "deny"– i.e. the appellant was offered the chance to appear again with better evidence of emotional stability.
[4] The Appellant in the current case was not "denied – for now", but simply "denied." 6-0. On June 10, 2016 he sent Board Secretary Atty. Fishbein an e-mail asking for reconsideration and this received no written response. A formal Motion for Re-consideration was filed – but denied as un-timely. Finally, a Motion to Open Judgement addressed to Atty. Fishbein received no written response and on inquiry the BFPE staff member said it had been filed un-read as correspondence

public safety concerns were not based on actual risks, but on mere speculation, stereotypes or generalizations about individuals with disabilities or perceived disabilities.

The DESPP presented the testimony of Sgt. Vafiades and Officer Hass who described in great detail their first hand knowledge of the events of May 14, 2014 and May 15, 2014. Over the objection of the Plaintiff (transcript 6-9-2016, page 35 line 25), Sgt. Vafiades gave hearsay testimony about the events of May 16, 2014.

Plaintiff vigorously disagreed with in-correct and extremely damaging statements in police reports. He cross-examined Sgt. Vafiades on his incorrect risk warrant allegation of May 19, 2014 that "Hope has a history of hearing voices" and he cross-examined Officer Hass about his incorrect statement in his report of May 14, 2014 that Plaintiff has "dementia-like symptoms." These completely un-true statements paint Plaintiff as severely mentally ill or demented. They are terribly damaging and persist despite repeated efforts with the WHPD to correct them.

Sgt. Vafiades maintained that the "history of hearing voices " referred to the one incident of being fearful that there was an intruder in his home on May 15, 2014 and making a 911 call. (transcript 6-9-2016, pages 31-32)

Officer Haas admitted that he could not remember his conversation with Mrs. Hope and did not deny that he may have misinterpreted or misheard a telephone conversation with her on May 14, 2014. (transcript 6-9-2016, page 53, line 8- page 54 line1)

The West Hartford Police Dept. has a letter from Dr. Calabrese in its files that specifically rebuts these statements – however the two officers and Atty. Giannone

seemed unaware that these two statements have been thoroughly discredited. (see Appendix, Dr. Calabrese's letter to WHPD dated 2-20-2015)

The Plaintiff testified that he agreed with Attorney Giannone that in May, 2014 he was in a hyper-vigilant, fearful, suspicious state of mind, i.e. paranoid. The Plaintiff disagreed with Attorney Giannone that in June, 2016 he was of "unsound mind."

At the BFPE hearing the Plaintiff introduced a psychiatric opinion into evidence from Dr. Lori Calabrese together with her C.V. (see Appendix – Section B). Dr. Calabrese has a stellar resume and is a Board Certified Forensic Examiner. She has treated the Plaintiff for twelve years and they have met four times a year. In sum:

> "I am a Board Certified psychiatrist in practice in South Windsor, but previously served as the Director of Psychiatry for The Court Evaluation Service for MetroBoston, an in-patient psychiatric unit for the assessment of persons whose aberrant behavior precipitated police involvement or legal charges. The unit under my direction was dedicated to assessing competency to stand trial, criminal responsibility, and dangerousness, and I have extensive experience in conducting these assessments."

In 2004 the Plaintiff initiated treatment with Dr. Calabrese for a depressive episode, one of several he experienced in his life. She diagnosed him at that time with a Mood Disorder and she prescribed a mood stabilizer called Lamictal that was highly effective. Plaintiff has been seeing Dr. Calabrese four times a year since 2004 for successful prophylactic treatment of Mood Disorder. She states that:

- "He has been asymptomatic and stable under my care for many years."
- "In my clinical opinion, and with a reasonable degree of medical certainty, the paranoia and aberrant behavior which led to Mr. Hope's hospitalization at the Institute of Living in mid-May, 2014 was a new condition which was

directly precipitated and caused by high doses of dopaminergic medications prescribed for Mr. Hope's Parkinson's Disease by another physician. "

- "This condition has been remedied…by discontinuing one of these medications, and dramatically tapering the other…"
- "It has not recurred and I do not expect it to recur…"
- "Mr. Hope has had complete cessation of paranoid delusions and continued improvement with restoration of his usual high level of functioning certainly for a period in excess of 12 months."
- "He remains under my care with his next appointment scheduled for July 13, 2016."
- "In my clinical opinion, and with a reasonable degree of medical certainty, Mr. Hope does not pose a risk of personal injury to himself or others due to any psychiatric condition."
- "I support his pistol permit being restored."

Dr. Calabrese's expert opinion was the only expert medical opinion entered into evidence at the hearing. [5] (transcript 6-9-16, page 85, line 8-13) The Board has a psychiatrist member, but he wasn't present that day. If there was any question of interpretation of Dr. Calabrese's letter the Board could have continued the case for consultation with their medically qualified member. Instead the Board and Atty. Giannone relied on non-medical opinion based on mere speculation, stereotypes, or generalizations about individuals with psychiatric disabilities_or perceived psychiatric disabilities.

Colonel Overturf (a non-physician) perseverated over the diagnostic term "re-current depressive episodes" and rejected Plaintiff's several attempts to explain that

---

[5] Plaintiff is a CT Licensed Clinical Social Worker, a non-medical mental health professional.

clinical diagnosis precedes treatment and that "re-current depressive episodes" refers to events prior to 2004. (transcript 6-9-16, page 74 line 25 – page 77) Colonel Overturf took this phrase out-of-context because the next sentence states, "He (Plaintiff) has been asymptomatic and stable under my care for many years…"

Colonel Overturf's misinterpretation then became further mangled and reified in Atty. Giannone's closing:

> "it's also concerning that he (Plaintiff) has a mood disorder which the Colonel stated as for the past decade under his care has been recurrent depressive episodes." (transcript 6-9-16, page 84, lines 18-21)

With all due respect, Colonel Overturf is not qualified as a mental health professional nor as a physician to be making diagnoses. Nor is Atty. Giannone. Here, Atty. Giannone argued from mere speculation, stereotypes or generalizations about individuals with disabilities or perceived disabilities and this is *prima facie* evidence of disability discrimination by the DESPP.

Colonel Overturf later in the hearing challenged the Plaintiff's current judgment with the following statement:

> "The other factor I'm considering is during these hearings, the Appellant challenged and attempted to justify the actions on the 14th, 15th and 16th as objective and he believed were reasonable in his mind the entire time." (transcript 6-9-2016, page 88, line 12)

First, the Plaintiff never said his actions were *objectively* reasonable, he testified that, "(f)rom my *subjective* point of view at the time that I deployed my .22 rifle, I thought I was within my rights as a citizen…" (transcript 6-9-2016, page ~~68~~, line 16)
58

Second, the Plaintiff clearly stated, "I have differences with the police about how this was handled but I think they were correct to take the firearms at that point and fill out the risk warrant." (transcript 6-9-2016, page 57, line 11)

Third, would Colonel Overturf deny Plaintiff the right to cross examine witnesses about the un-true and damaging statements in their reports? Is the Plaintiff allowed to argue mitigating factors?

At the end of the hearing Chairman Blando made the following astonishing statement:

> "I would just add to that that to just point out, at this time, Doctor Calabrese has not chosen to discharge the - the Appellant. She continues to see him and in her words remains under her care and he has an appointment scheduled for next month. So Doctor Calabrese certainly must have some concerns as to the mental state of the – of the Appellant, at least enough to continue seeing him and not to have discharged him. And to me that's relevant." (transcript 6-9-2016, page 89, lines 9-19)

Therefore, according to the Board Chairman, just before the vote, maintaining highly successful, long term preventative treatment for a Mood Disorder is a criteria for "unsuitability." This leap violates the principle of "ejusdem generis" because the statute lays out specific psychological disqualifiers and none apply to Plaintiff. This is *prima facie* evidence of discrimination against persons with psychiatric disabilities or perceived psychiatric disabilities.

Claim 2: The Board prosecuted a theory that Plaintiff's right -side resting tremor made him "unsuitable" for a pistol permit, ignoring compelling evidence to the contrary and without any expert opinion or performance based evidence to support this speculation.

Chief Rosensweig ( a non-physician) opened an inquiry into the Plaintiff's early stage Parkinson's disease:

> "We haven't talked about physical issues. In your presentation here today I watched you drink the water and you had a difficult time with that. Now you don't have to shoot a qualifying course because this is a revocation hearing, however I have my doubts that you could hold a gun and keep it steady and actually physically do that. So what do you think?" (transcript, 6-9-16, page 70, line 4)

First, the Plaintiff did not have a difficult time with the pro-offered bottle of water. He held the bottle with his left hand, removed the cap with his right, drank from the bottle and then screwed the cap back on and put the bottle aside. Not a drop was spilled. He didn't miss a beat in his presentation as is evident in the audio transcript. Nothing was dropped or bobbled.

Second, if there is a question of physical ability or disability not put forth in the initial charge, why not offer a measure or procedure (such as a "qualifying course" or "live fire" exercise) as a way to generate objective data? This would be a reasonable accommodation. The onus would be on the Plaintiff to secure such data. However Chief Rosensweig frames the discourse from the beginning to preclude this course of action. He relies on mere speculation, stereotypes, or generalizations about individuals with movement disorder disabilities or perceived disabilities.

Third, Board Member Rosensweig was noticing the Plaintiff's right hand resting tremor, the hand holding the bottle cap. It is called a 'resting tremor' because it only manifests at rest. When there is intention, a force of will, the tremor goes away. The Plaintiff demonstrated this at the hearing:

Plaintiff: Well, by force of will I can keep my hand steady.
Attorney Fishbein: Well, that isn't that steady
Plaintiff: It's good enough to go to rifle range and fire off a .22. And the last target I hit…
Chief Rosensweig: But it may not be good enough to fire at a person in public.
Plaintiff: I don't want to fire at a person in public.
Chief Rosensweig: Well no, but that's what we're authorizing you to be able to do – to carry the gun in public – or would be authorized to do.
Plaintiff: I never used the permit to carry. I used the permit to get into the range, buy ammunition, it covers a lot of ground. (transcript, 6-9-16, page 70, line 11)

As this exchange demonstrates, Chief Rosenweig is generating a barrier based on mere speculation, stereotypes, or generalizations about individuals with disabilities or perceived disabilities. It is disability discrimination that an inquiry into "suitability" - "the essential character or temperament necessary to be entrusted with a weapon" - devolves into the ability to "fire at a person in public." Non-disabled applicants are required to learn the fundamentals of firearm safety and operation - but they are not questioned or tested on this new standard of "firing at a person in public." Where did this come from? It's a distasteful jump from seeking the ability to transport handguns to a public range and to use the public range for shooting sport and recreation - to being mandated to be able to "fire at a person in public." This is *prima facie* disability discrimination.

As distasteful as is this High Noon standard, the Plaintiff could meet it. Chief Rosensweig assumed that the Plaintiff is right-handed. He seemingly failed to notice that the Plaintiff writes left handed. The Plaintiff can fire a handgun with either extremity. The resting tremor only affects his right extremity. And the resting tremor

doesn't significantly alter performance of the affected limb as will be confirmed by objective evidence offered for admission at the court hearing.

The Plaintiff testified that he had saved targets that demonstrate the ability to hit a six inch diameter target 20/20 shots at 100 yards with a rifle. The existence of these targets was not questioned. However, the significance of the targets was dismissed by Chief Rosensweig as not relevant to shooting a pistol. (transcript, 6-9-16, page 71, line 14 )

This is a crucial bit of testimony and it is very highly relevant to the question of being able to manage a handgun. The targets mentioned are actually slightly larger, 8 inch x 8 inch and there are two – each 10/10 - - for a total of 20/20.

Referring to the analysis of this data [6] – consistently hitting an 8 inch x 8 inch target @100yards means aiming the rifle to within +/- 1/16 of a degree of arc on the vertical axis and +/- 1/16 of a degree of arc on the horizontal axis. Aiming a rifle with this degree of precision, with Parkinson's or without Parkinson's, is a dramatic demonstration of fine motor control in both extremities, working together. In fact, it would be hard to invent a more telling demonstration of fine motor skill and firearms management.

This example of actual ability was minimized by Chief Rosensweig:

---

[6] Geometric Analysis of Rifle Marksmanship @ 100 Yards and an 8 inch x 8 inch Target

Consistently hitting an 8 inch x 8 inch target @ 100 yards is equal to shooting within a tolerance of +/- 1/16 of a degree of arc on the vertical axis and +/- 1/16 of a degree of arc on the horizontal axis.

Calculation

The circumference of a circle (360 degrees of arc ) @ 100 yds = Pi x 2R
R= 100 yards = 300 ft = 3600 inches
Pi x 2R = 3.14 x 2 x 3600 inches = 22,608 inches
Therefore; one degree of arc = 22,608 inches / 360 degrees = 62.8 inches/degree of arc
An 8 inch target therefore equals 8 inches divided by 62.8 inches/degree of arc = .1274 degrees of arc = approximately 1/8 of a degree of arc.

Another way of stating this result is that hitting an 8 inch x 8 inch target at 100 yards requires a variance on the horizontal axis of no more than +/- 1/16 of a degree of arc and a variance on the vertical axis of no more than +/- 1/16 of a degree of arc.

Using the principles of geometry, halving the range reduces the dimensions of the target in direct proportion. Therefore the ability to hit an 8 inch x 8 inch target at 100 yards is geometrically equal to consistently hitting:

- a 4 inch x 4 inch target at 50 yards; or
- a 2 inch x 2 inch target at 25 yards; or
- a 1 inch x 1 inch target at 12.5 yards.

Pistol targets are typically 12 inch x 12 inch and range is typically between 10 and 20 yards. Therefore; it follows that a person possessing the skill and physical ability to accurately hit targets with a rifle at long range will also have the skill and physical ability to hit a much larger target at a much shorter distance with a pistol or revolver.

Chief Rosensweig: That's different than holding a handgun or holding a rifle like this. Anyway, that's --- it seems to me---
Mr. Hope: I don't think it's a disqualifying factor.
Chief Rosensweig: *No, probably not.* (emphasis added) But it's certainly something for us to consider. (transcript 6-9-2016, page 71, line 14)

In the end however the data about actual ability was given no weight and the Plaintiff was assumed to be too disabled to manage a handgun – all due to a sip of water and mere speculation, stereotypes, or generalizations about individuals with disabilities or perceived disabilities. This is *prima facie* evidence of disability discrimination.

At the very end of the hearing Chief Rosenweig made the following statement:

"The only thing I could add is the Appellant testified that the – his actions were related to the dosage of the drug and that was subsequently tapered off. However, he also testified that over time, drugs will be tinkered with, changed, the disease will change over time. And there is very little confidence that this won't happen again or certainly it's a very good possibility with the change in medications it could happen again.' (transcript 6-9-2016, page 89, line 20)

Chief Rosensweig is not qualified to render neurological prognosis or speculate about pharmacology. Here he makes outrageous predictions and gives probabilities for neurological events that are entirely out of his range of expertise and in direct contradiction to Dr. Calabrese's expert opinion. This is *prima facie* evidence of disability discrimination.

With nothing to go on in the way of objective data or expert opinion supporting his position, Attorney Fishbein (a non-physician) expanded upon the High Noon theory:

Plaintiff: Well, I kind of challenge the idea of competence with a firearm. First of all, I passed the NRA test with 100% - the first time my instructor saw that kind of score. And second of all, I'm proficient with firearms, even with Parkinson's. And shooting is, after all, a handicapped accessible sport.
Atty Fishbein: Shooting at a range.
Plaintiff: You can go to the range and get a bench and people with various levels of handicap can shoot at the range.
Atty Fishbein: But I'm looking at...
Plaintiff: But you can't get into the range without a Pistol Permit.
Atty Fishbein: I'm looking at is you're walking down the street and you have a handgun on you. If we were to give you a pistol permit, that would afford you the opportunity. And you get into a situation where you have reason to believe that your life is being threatened and you want to use the firearm defensively. That is an extremely stressful situation and I think part of your presentation here today has been that your tremors get worse in an extremely stressful situation and that's what I'm balancing here. So we're not talking about the range, we're talking about defensive use of firearms.
Plaintiff: I think that's an interesting hypothetical, but it remains a hypothetical.
(transcript, 6-9-16, page 79, line 7 )

Unpacking this colloquy, Atty. Fishbein posits multiple layers of speculation:

-If a person with Parkinson's were found "suitable" for a Pistol Permit; and

-if that person felt morally justified in taking another person's life or grievously injuring them; and

-if that person chose to carry a loaded handgun in public; and

-if that person was walking down the street; and

-if that person got into a "situation"; and

-If that person felt their life was being threatened; and

- if that person decided to use the loaded handgun to shoot the perceived aggressor; and

- if their right-sided resting tremor was worsened by the stress of this situation – which is pure speculation by a non-physician; and

- if they were unable to aim and fire from their right side; and

-if for some unknown reason they couldn't operate the firearm with their left hand which is not affected by Parkinson's;

Then what?

What is the point of the hypothetical? That the aggressor might harm the person with the firearm? What is the point of this chain of speculation? And how does it relate to "suitability", "the essential character or temperament necessary to be entrusted with a weapon?"

The point is that hypothetical High Noon scenarios are not posed to non-disabled citizens applying for a Pistol Permit. Applying for a Pistol Permit doesn't require that a person feel morally justified or prepared to shoot another human being in public. This is a truly strange criteria for "suitability." It is also *prima facie* evidence of disability discrimination.

Atty Fishbein has no training or expertise in neurology – yet he is speculating about how Plaintiff's right side resting tremor might affect his performance in a High Noon scenario. This is egregious over-reaching on his part, relying on mere speculation, stereotypes, or generalizations about individuals with disabilities or perceived disabilities and is further *prima facie* evidence of disability discrimination.

Later, Board Member Kuck (a non-physician) shared his own hypothetical scenario:

> Mr. Kuck : My primary concern is, if you are carrying a loaded handgun on your body how would you keep someone from taking it from you?
>
> Plaintiff: I wouldn't be carrying a loaded handgun on my body.
>
> Mr. Kuck : But you are looking for a permit to carry.
>
> Plaintiff: I'm mostly looking for a permit to transport a firearm.... (transcript, 6-9-16, page 81, line 23 )

The underlying premise of Mr. Kuck's question is that Plaintiff's Parkinson's disease makes him weak, in-effectual, unable to defend possession of a firearm. This reveals a huge implicit bias. Plaintiff is 5' 11" and weights 225 lbs. He is in no way weak or ineffectual. He can do 20 push-ups on request. He mows the law, blows snow out of the driveway, jacks up his car to change the oil, cuts firewood with a chainsaw and splits it with a maul. More to the point, non-disabled people with a slight build, male or female, are not asked this question. So this is another, *prima facie* example of disability discrimination.

Later in the hearing Mr. Kuck confirms that he is basing his decision against "suitability" on the right side resting tremor of the Plaintiff:

> Mr. Kuck: Some time back, a blind woman came before this Board, had a perfect stellar record, very suitable in every sense of the way, but she was not suitable to have a license to carry a handgun. Because once you pull the trigger, you cannot call the bullet back.
>
> All of our bodies will betray us sooner or later as we age and sometimes it's time to hang-up that what we like to do. This gentleman may be very suitable in every sense, a moral sense, but with the tremor that he has I would not want to

be standing down range when he was firing at something else." (transcript, 6-9-16, page 87 line 13 )

The Plaintiff agrees with the opinion that he is morally suitable in every sense of the word, as was the blind applicant. The Plaintiff takes vigorous exception to the beliefs that:

-all of our bodies will betray us sooner or later as we age; and

- sometimes it's time to hang-up that what we like to do.

These statements are conclusory and are not based on any objective evidence of functional ability. Having Parkinson's is not a "betrayal" by one's body and it doesn't mean "it's time to hang up that what we like to do." These may be the speaker's personal values, but they do not align with the ADA and are *prima facie* evidence of disability discrimination.

Mr. Kuck's concern is not based on any evidence of performance ability, but on mere speculation, stereotypes, or generalizations about individuals with disabilities or perceived disabilities. In fact, Plaintiff is demonstrably proficient with handguns and will introduce objective evidence of this ability to the court.

As for Mr. Kuck's un-founded concern about being down-range from the Plaintiff, he need not worry because the Plaintiff was taught at age 11 one of the most basic rules of firearms safety which is "Never Aim or Fire a Gun if a Person is Downrange." In 55+ years he has never violated this precept.

Atty Fishbein proceeded to make mistaken statements regarding the scope of handgun licensing:

Atty. Fishbein: You know, not that I'm going to sit here and give you legal advice but, you know, today one can go get an eligibility certificate and purchase ammunition. It doesn't give you the same rights as it does with a pistol permit because what we're dealing with here is whether or not we feel comfortable giving you the legal right to bring a loaded handgun out in public. It has nothing to do with the range. You know, once again, I'm not giving you legal advice, but, you know, I don't believe that you need a pistol permit to go to the range. (transcript 6-9-2016, page72, line 8 – 18)

In fact, an Eligibility Certificate for Pistols and Revolvers allows purchase of a handgun, purchase of ammunition, transport to the home or place of business in original packaging, transport between one's old home or place of business to a new home or place of business, and transporting to "formal pistol or revolver training" which means. "pistol or revolver training at a locally approved or permitted firing range or training facility" and very little else. The penalty for illegally carrying or transporting a handgun is severe – it's a Class D felony with a one year mandatory sentence, absent mitigating factors. [7]

---

[7] Sec. 29-35. Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any parole officer or peace officer of this state, or any Department of Motor Vehicles inspector appointed under section 14-8 and certified pursuant to section 7-294d, or parole officer or peace officer of any other state while engaged in the pursuit of official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined in section 27-103, or of this state, as defined in section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person transporting any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while transporting the same from the place of sale to the purchaser's residence or place of business, or to any person removing such person's household goods or effects from one place to another, or to any person

Therefore, it is not true that one can "go to the range" i.e. transport a handgun in a vehicle on the strength of an Eligibility Certificate except for "formal pistol or revolver training" and one cannot gain admittance to the State of Connecticut, DEEP (Department of Energy and Environmental Protection) public range in Glastonbury for

---

while transporting any such pistol or revolver from such person's place of residence or business to a place or individual where or by whom such pistol or revolver is to be repaired or while returning to such person's place of residence or business after the same has been repaired, or to any person transporting a pistol or revolver in or through the state for the purpose of taking part in competitions, taking part in formal pistol or revolver training, repairing such pistol or revolver or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States and is permitted to possess and carry a pistol or revolver in the state or subdivision of the United States in which such person resides, or to any person transporting a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person transporting an antique pistol or revolver, as defined in section 29-33. For the purposes of this subsection, "formal pistol or revolver training" means pistol or revolver training at a locally approved or permitted firing range or training facility, and "transporting a pistol or revolver" means transporting a pistol or revolver that is unloaded and, if such pistol or revolver is being transported in a motor vehicle, is not readily accessible or directly accessible from the passenger compartment of the vehicle or, if such pistol or revolver is being transported in a motor vehicle that does not have a compartment separate from the passenger compartment, such pistol or revolver shall be contained in a locked container other than the glove compartment or console. Nothing in this section shall be construed to prohibit the carrying of a pistol or revolver during formal pistol or revolver training or repair.

(b) The holder of a permit issued pursuant to section 29-28 shall carry such permit upon one's person while carrying such pistol or revolver.

<u>Sec 29-36g (f)</u> An eligibility certificate for a pistol or revolver shall not authorize the holder thereof to carry a pistol or revolver upon his person in circumstances for which a permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29-28 is required under section 29-35.

<u>Sec. 29-37. Penalties</u> -- (b) Any person violating any provision of subsection (a) of section 29-35 shall be guilty of a class D felony, and, in the absence of any mitigating circumstances as determined by the court, one year of the sentence imposed may not be suspended or reduced by the court. The court shall specifically state the mitigating circumstances, or the absence thereof, in writing for the record. Any pistol or revolver found in the possession of any person in violation of any provision of subsection (a) of section 29-35 shall be forfeited.

pistol shooting without a Pistol Permit unless under the formal training supervision of an instructor with a Pistol Permit. Nor could a person transport a pistol to rural private property to engage in shooting sport or recreation with the consent of the landowner.[8]

For someone who is proficient with firearms for half a century, this is a big barrier to independent shooting sport and recreation at a State facility or private lands and does not conform to the ADA.

It's surprising that the members of the Firearms Board didn't correct this misinterpretation of the law. Perhaps they are also misinformed about the scope of regulation. Atty. Sgt. Giannone was also silent on the matter though he is a representative of DESPP which is charged with enforcement of the firearms laws.

It's troubling that the Board minimizes the effect of denying "suitability". In the case at issue the Board is potentially denying the Plaintiff access to pistol and revolver shooting sport and recreation, in Connecticut, not ***for now,*** but for life. It's also troubling that the Board is misinterpreting the very statutes they are charged with administering.

Toward the end of the hearing the Chairman asks Atty. Fishbein to do a "factual recitation" of the hearing.

> "The Appellant does not deny that those incidents (in May, 2014) happened and presents evidence with regard to the – perhaps him being over-medicated, that the paranoid activity being the result of the over-medication that, at this point, his change in medication has tapered – tempered that situation.

---

[8] Atty Fishbein made a similar statement in Case #14-213 D (the blind applicant referenced above) heard on 3-12-2015:

> @ 50':52" Atty Fishbein: "One can still go to the range, one can own a handgun in their home or place of business without having a Pistol Permit. One can take that handgun to the range, open/empty transport, and then with the assistance of someone else, a caring priest perhaps, can shoot at the range."

Doctor Calabrese's letter is very helpful to the Appellant, in my opinion." (transcript 6-9-2016, page 86, line 15 – 22)

Thus, since Doctor Calabrese, a Board Certified Forensic Examiner in psychiatry with impeccable credentials, opined that Plaintiff has long since recovered "his usual high level of functioning", the stated sense of the meeting strongly infers the judgment that Plaintiff is of "sound mind."

The factual recitation continues:

"We also have the issue of the tremors resulting from Parkinson's which is a sad situation for someone who has been in the shooting sports since they were about 11. I want to make it clear that if this Board was to find that the tremors make the Appellant unsuitable to have a pistol permit, it does not, in any way, shape or form preclude him from participating in the shooting sports. A review of the statutes would be quite apparent in that regard.

What's before us today is whether or not we are comfortable with affording the applicant the ability to carry a loaded handgun in public. (transcript 6-9-16, page 87, line1-9)

This part of the recitation demonstrates that the Board acted not on the basis of the DESPP's allegation of "unsound mind", but the Board ruled on the belief that Plaintiff's right sided resting tremor would interfere with the High Noon test of being able and willing to "fire at a person in public." Again, this is a test that is not posed to other applicants for a Pistol Permit. And it is a test that is based on mere speculation, stereotypes, or generalizations about individuals with disabilities or perceived disabilities. It does not comply with the ADA and is *prima facie* evidence of disability discrimination

The recitation also demonstrates the sense of the meeting that the Board is not concerned that Plaintiff is a danger to other people or himself.[9] The discussion about obtaining an Eligibility Certificate reveals no safety concerns for members of his household or visitors to his household or to himself or to people at the range (if he were able to go there).

E. Request for Relief - The Plaintiff asks that the court rule that DESPP failed to demonstrate that he is of "unsound mind' or that he is "lacking the essential character or temperament necessary to be entrusted with a weapon" or that he presents a risk to the safety of others. The Plaintiff further asks the court to find:

1. that three out of six Board members (Chief Rosenweig, Atty. Fishbein and Mr. Kuck) exhibited *prima facie* evidence of disability discrimination in their testimony in regard to his right hand resting tremor and their assumption that he is right handed;
2. that Chairman Blando's statement about outpatient mental health treatment was *prima facie* disability discrimination;
3. that the Board created hypothetical criteria that are not used to judge non-disabled applicants (firing at a person in public);
4. that Atty. Fishbein misstated the law he is charged with administering;
5. that the Board had access to a psychiatrist / physician member but chose to rule for the DESPP not based upon any objective measure of ability nor upon any expert opinion, but upon mere speculation, stereotypes, or

[9] "if this Board was to find that the tremors make the Appellant unsuitable to have a pistol permit, it does not, in any way, shape or form preclude him from participating in the shooting sports"

generalizations about individuals with disabilities or perceived disabilities that is prohibited by the ADA.

6. The Plaintiff asks the court to rule that the DESPP restore and renew his Pistol Permit.

F. Jury Demand - Do you wish to have a jury trial? No.

Donald Hope | Donald Hope
Plaintiff's Original Signature | Printed Name

98 Bainbridge Rd., West Hartford, CT 06119 / 860-236-3220 / fax 860-313-1407

donhope48@gmail.com

Plaintiff's Full Address / Telephone / Fax / E-mail Address

**Declaration Under Penalty of Perjury**

The undersigned declares under penalty of perjury that he/she is the plaintiff in the above action, that he/she has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. Sec. 1746: 18 U.S.C. Sec. 1621.

Executed at West Hartford on 11/17/16

Donald Hope

Plaintiff's Original Signature